EAG/AL
F.# 2010R00153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          11 CR 30 (KAM)

JOHN DUNN,

             Defendant.

- - - - - - - - - - - - - - - - X


MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
MOTION *IN LIMINE* TO ADMIT EVIDENCE OF CERTAIN BAD ACTS
<u>AT TRIAL AGAINST THE DEFENDANT JOHN DUNN</u>


                                     LORETTA E. LYNCH
                                     United States Attorney
                                     Eastern District of New York
                                     271 Cadman Plaza East
                                     Brooklyn, New York 11201


Elizabeth Geddes
Allon Lifshitz
Assistant U.S. Attorneys
     (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its motion in limine to admit at trial evidence of certain bad acts by the defendant John Dunn.  As demonstrated below, these acts are admissible pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)").  For the reasons set forth below, the Court should grant the government's motion.

STATEMENT OF FACTS

I.   Charges

A.   Illegal Gambling

In Count Thirty-one of the indictment, the defendant is charged with operating, together with others, including two individuals who were long associated with the Colombo organized crime family of La Cosa Nostra ("LCN") (the "Colombo family") and were cooperating with law enforcement (hereinafter, "CW-1" and "CW-2"), an illegal gambling business in the basement of 24 Avenue O, Brooklyn, New York ("24 Avenue O"), in violation of 18 U.S.C. § 1955(a).  The gambling business was operational between July 2009 and January 2010 and consisted of illegal poker games and two electronic video game machines that operated under the brand name "Broadway."

For his part, the defendant, among other contributions, supplied the two Broadway machines, serviced the machines, offered to provide chips and dice for the illegal poker games and provided advice to CW-1 to reduce detection by law enforcement.

In addition, the defendant and another individual went to 24 Avenue O approximately once a week to collect the money deposited into the Broadway machines, determine the winnings – or "payout" - to individuals playing the machines, and split the profits. During one weekly visit, the defendant discovered that "Craig," an individual affiliated with "JC" and "Joe's Bar," had won $300 playing the Broadway machines at 24 Avenue O; CW-1 later agreed to deliver the winnings to Craig at Joe's Bar.  Others, including co-defendants and LCN associates Roger Califano and Giovanni Galluzzo, managed the illegal poker games held at two card tables in the room adjoining the room where the Broadway machines were housed.

The defendant and his coconspirators violated New York State law, an element of a violation of 18 U.S.C. § 1955(a), through the operation of the gambling business at 24 Avenue O by "knowingly advanc[ing] [and] profit[ing] from unlawful gambling activity."  New York Penal Law § 225.05.  Under New York law, a person engages in "gambling" when "he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."  New York Penal Law § 225.00(2).  With respect to the poker games conducted at 24 Avenue O, players typically would pay a minimum of $300 to

3

participate in a game and the "house" would take a percentage of

the total "buy-in" prior to paying out any winners.  With respect

to the Broadway machines, players would deposit money into the

machines and if the players won, an employee working that day

would typically pay the players the winnings; the defendant and

others split the profits from the machines.

II.   Overview Of The Government's Evidence
      Of The Uncharged Crimes

        Below is a brief overview of the relevant facts

pertaining to the government's evidence of the "uncharged"

crimes.

        Under the protection of members and associates of

organized crime,[1] the defendant has long engaged in the business

of supplying and servicing lucrative slot machines to a panoply

of establishments in New York City.  On several recordings made

by CW-1, the defendant referenced the "spots" and "stops" where

he had placed the machines.  These included commercial and

private, legal and illegal businesses.  For example, on one

recording made by CW-1 on or about August 24, 2009, the defendant

(identified in the transcript as "JD") told CW-1 about a raid by

law enforcement at an American Legion establishment at which the

---

[1]     In the 1990s, the defendant operated under the
protection of the Colombo family.  More recently, the defendant
has operated under the protection of the Gambino family.

4

defendant had placed machines that operated under the brand name

"Pot of Gold":[2]

> JD:  I was there for a long time.  I was
>       doing so good.  That was one of these
>       American Legion things.
>
>                  * * *
>
> JD:  [UI] but this one was fuckin' doing
>       excellent.  And we had it set up the
>       right way.  This was like two or three
>       years ago.
>
>                  * * *
>
> JD:  They're not supposed to.  So now, I
>       lose, fuck, maybe, I have six Pot of
>       Golds in there, slot machines.  I had it
>       set up in the basement, [ui] everything.
>       [UI] 30,000 hit.  10,000 dollars in the
>       machine.  So I had to pay 5,000 back to
>       the club because they had $5,000 in
>       payouts.

Another cooperating witness ("CW-3") has advised that as of June

2008, the defendant had one or more electronic slot machines at

Joe's Bar and Grill, located on Avenue U in Brooklyn, New York,

and serviced the machines on a weekly basis.  A fourth

cooperating witness ("CW-4") has advised that the defendant

placed a machine in CW-4's barbershop several years ago.  The

information from CW-4 is corroborated by a consensual recording

made by CW-1 on or about September 28, 2009, on which the

defendant said, "You know how they [members and associates of the

---

[2]     The excerpts provided herein are based on draft
transcriptions.

5

Colombo family] met [CW-4]?  From me, from fuckin' machines in the place."

As a supplement to the defendant's electronic slot machine business, the defendant has also engaged in other illegal gambling businesses, such as "numbers" and sports-betting, and loansharking.  For example, on a consensual recording made by CW-1 on or about June 26, 2009, the defendant advised:

> CW-1:   My friend who opened up a barber shop might want one machine.  Maybe we'll throw that in there too.
>
> JD:     Don't even have to touch it.  I have people.  They take care of it.
>
> CW-1:   Oh, okay.
>
> JD:     And whatever we make, me and you split.
>
> \* \* \*
>
> CW-1:   Okay, I'll find out too with this kid with the barbershop.  Do we have to give him anything for the spot or we just?
>
> JD:     Um.  For that, I wouldn't.
>
> JD:     You know what, the money's not there no more.  Listen, don't get me wrong, they start <u>taking numbers</u>, we'll give them something.
>
> CW-1:   Alright.
>
> JD:     You know, that's what I usually do with <u>loansharking stuff</u>.

6

In addition, in September 2009, the defendant supplied CW-1 with $5,000 to purportedly finance an illegal sports-betting business operated by other associates of La Cosa Nostra.

Finally, on at least one occasion, the defendant has used his business to assist other members and associates of organized crime in evading prosecution.  For example, on a recording made by CW-1 on or about June 2, 2009, the defendant told CW-1 that after Frank Hydell, who prior to his murder in April 1998 was an LCN associate, was charged with an extortion of an individual affiliated with someone the defendant knew in connection with the defendant's business, the defendant directed the individual to withdraw the accusation:

> JD:  I helped him [former La Cosa Nostra associate Frank Hydell] with an extortion and, uh, after that, I ended up becoming friends with him because he was like, you know, you don't get too many people who stand up to me.
>
>                         * * *
>
> JD:  I couldn't believe it.  Like, you know.  And.  He was like, you know.  And then he got in trouble for an extortion.  Pakistani guy shaking a store [UI] and I knew the guy's cousin from the machines and I told them, listen this is [UI].  So he got off.  So I became tight with him after that.

<u>ARGUMENT</u>

The government moves <u>in</u> <u>limine</u> to secure rulings regarding the admission of the defendant's participation in the other crimes, wrongs or acts described above pursuant to Rule 404(b).

I.   <u>Legal Standard: Rule 404(b) Evidence</u>

The Second Circuit has established a three-prong test for the admission of "other crimes" evidence under Rule 404(b). First, a trial court must determine that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity.  See <u>United States v. Pitre</u>, 960 F.2d 1112, 1119 (2d Cir. 1992); <u>United States v. Mickens</u>, 926 F.2d 1323, 1328 (2d Cir. 1991).  For example, such evidence is admissible pursuant to Rule 404(b) if relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  See <u>United States v. Ortiz</u>, 857 F.2d 900, 903 (2d Cir. 1988).  Second, the trial court must determine that the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence and that its probative value is not substantially outweighed by the danger of unfair prejudice.  See <u>Pitre</u>, 960 F.2d at 1119; <u>Mickens</u>, 926 F.2d at 1328.  Third, the court must provide an appropriate limiting instruction to the jury, if one is requested.  See <u>Pitre</u>, 960 F.2d at 1119.

8

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," <u>Levy</u>, 731 F.2d at 1002 (citing <u>United States v. O'Connor</u>, 580 F.2d 38, 40 (2d Cir. 1978)), the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application.  <u>Id.</u> ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

Here, the government offers evidence of defendant's participation in uncharged crimes not to show propensity but rather, as explained below, as relevant background to complete the story of the charged crimes and the relationships, including relationships of trust, among the defendant, CW-1 and their coconspirators.  See <u>United States v. Langford</u>, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history.").  Further, evidence of the defendant's involvement in these other crimes is relevant to establishing intent, knowledge, absence of mistake or accident, and opportunity.  See <u>United States v. Bok</u>, 156 F.3d 157, 166 (2d Cir. 1998).

9

II.   Evidence Of The Defendant's Uncharged
      Crimes Is Admissible Under Rule 404(b)

      A.    The Defendant's Involvement In The Uncharged
            Crimes Provides Relevant Background To Complete
            The Story Of The Charged Crimes And
            Relationships of Trust

The Second Circuit has repeatedly permitted the

admission of evidence under Rule 404(b) to provide background

information to inform the jury of the complete story relating to

the crime charged.   United States v. Williams, 205 F.3d 23 (2d

Cir. 2000); United States v. Rosa, 11 F.3d 315, 33-334 (2d Cir.

1993) (holding that codefendants' relationship over a 14-year

period, during which stolen property and narcotics crimes were

committed, "was properly admitted to explain how the illegal

relationship between the two [defendants] developed and to

explain why [one defendant] . . .  appointed [the other

defendant] . . . to a leading position in the Organization");

United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One

legitimate purpose for presenting evidence of extrinsic acts is

to explain how a criminal relationship developed; this sort of

proof furnishes admissible background information in a conspiracy

case[.]"); Pitre, 960 F.2d at 1119 ("Prior act evidence may be

admitted to inform the jury of the background of the conspiracy

charged, to complete the story of the crimes charged, and to help

explain to the jury how the illegal relationship between

participants in the crime developed.").

In <u>United States v. Williams</u>, the Second Circuit upheld the admissibility of evidence relating to the defendant's prior criminal activities - including marijuana distribution, credit card fraud and filing false charges of assault - with two coconspirators involved in the charged conspiracy to distribute cocaine.  205 F.3d at 23.  In reaching this conclusion, the Second Circuit held that "evidence of [the defendant's] prior criminal conduct with his coconspirators was relevant to 'inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'"  205 F.3d at 33-34.

The uncharged acts that the government seeks to admit are relevant to establishing the relationships between the defendant and CW-1 and among the defendant and other LCN associates.  That is, the crimes help explain to the jury how the illegal relationship among the participants in the crime arose. Specifically, the defendant's long affiliation with organized crime and, specifically, the Colombo family, with which the defendant perceived CW-1 to still be associated, is evidence of the relationship of trust between the defendant and CW-1 and helps to explain the defendant's willingness to enter into an illegal business venture with CW-1 and other associates of the Colombo family.  Similarly, the defendant's admissions to CW-1

11

about his past participation in loansharking and a scheme to
convince a witness to not cooperate with law enforcement is
probative of the relationship of trust between the defendant and
CW-1 and thus constitutes evidence of the defendant's willingness
to engage in illegal activity with CW-1.  Cf. United States v.
Harris, 733 F.2d 994, 1007 (2d Cir. 1984) (affirming as probative
of the basis for the defendant's trust admission of testimony by
witness about prior criminal activity with the defendant where
defendant had made incriminating statements regarding his
participation in the charged crime).

In addition, CW-3's testimony that the defendant
supplied and serviced one or more slot machines at "Joe's Bar" on
Avenue U helps to explain the defendant's knowledge of and
relationship with Craig, the individual who won $300 playing one
of the Broadway machines at Avenue O.  Accordingly, the testimony
is appropriate to inform the jury of the background and to
complete the story of the crime charged.

B.   Evidence Concerning The Defendant's Involvement
     In The Uncharged Crimes Evidences Intent

The evidence of defendant's involvement in the
uncharged acts detailed above is admissible to show intent, see
Fed. R. Evid. 404(b); United States v. Bok, 156 F.3d 157, 166 (2d
Cir. 1998), which the government anticipates will be at issue.

Specifically, the government anticipates that the
defendant will argue that his provision and servicing of the two

12

Broadway machines at 24 Avenue O for CW-1 and others did not
amount to intentionally conducting, managing, supervising,
directing or owning all or part of a gambling business, as
required under 18 U.S.C. § 1955(a).  The fact that the defendant
has a long history of involvement in operating uncharged gambling
businesses with other individuals associated with the Colombo
family and organized crime is probative of the fact that he
intentionally became involved in the charged illegal gambling
business with LCN associates.  See, e.g., United States v.
Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) (evidence that the
defendant had previously engaged in narcotics trafficking with
his coconspirator was highly probative of the defendant's intent
to enter another drug conspiracy with the same coconspirator, and
to rebut the defendant's defense of innocent association).

        In addition, the government anticipates that the
defendant will argue that the business did not operate in
violation of New York State law because the provision of Broadway
machines violates New York law only when Broadway players are
paid winnings (as opposed to simply amassing additional credits
to prolong play).  See N.Y. Penal Law 225.00(7a) ("A machine
which awards free or extended play is not a gambling device
merely because such free or extended play may constitute
something of value provided that the outcome depends upon the
skill of the player and not in a material degree upon an element

13

of chance."). Accordingly, mere possession of Broadway machines

is not a violation of New York law (whereas possession of

machines that automatically pay winnings – such as Pot of Gold

machines – is a violation of New York law). Indeed, throughout

the recordings, the defendant expressed to CW-1 his reservations

about supplying the type of video game machines that merely

possessing is illegal. The defendant's commentary to CW-1 about

the raid that occurred at the American Legion – and the seizure

of the Pot of Gold machines and their proceeds – thus helps to

explain the defendant's reluctance to provide similar Pot of Gold

machines to 24 Avenue O. Such reluctance is probative of the

defendant's intent to engage in a business that violated state

law – just one that had a lesser likelihood of detection by law

enforcement. Similarly, the defendant's intentional

participation and proposal to participate in other illegal

gambling activities with CW-1 – namely financing a sports-betting

business and proposing a "numbers" business – is probative of the

defendant's intent to enter into an illegal gambling business

with CW-1 and others.

C. Evidence Concerning The Defendant's Involvement
In The Uncharged Crimes Evidences Opportunity

The evidence of defendant's involvement in the

uncharged acts detailed above is further admissible to show

"opportunity." Fed. R. Evid. 404(b). That is, the defendant's

history of providing machines to various establishments is

14

evidence of his opportunity, namely, his access to the machines, to provide such machines to CW-1 for the charged gambling business.

        D.     The Probative Value Of The "Other Crimes" Evidence Is <u>Not Substantially Outweighed By Any Prejudicial Effect</u>

        Finally, the probative value of these uncharged acts is not substantially outweighed by their prejudicial effect. Evidence of other crimes is admissible when offered for a proper purpose through the various types of evidence, including the testimony of cooperating witnesses, so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crime[] with which [the defendant has been] charged.'" <u>Pitre</u>, 960 F.2d at 1120 (quoting <u>United States v. Roldan-Zapata</u>, 916 F.2d 795, 804 (2d Cir. 1990)). Where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under the Rule 403 balancing test. <u>See</u> <u>United States v. Livoti</u>, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force with an arrestee, choked another arrestee on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction").

        As noted above, the evidence relating to the other criminal acts listed above will come primarily from the testimony of cooperating witnesses or through recorded conversations.

15

Accordingly, the quality of the evidence is no more prejudicial

than that offered with regard to the charged crime.  See United

States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994)

(Korman, J.) ("If the jury found these witnesses to be credible,

the defendant would be convicted even if the accomplices were not

permitted to testify about [the uncharged crimes]").

Furthermore, the uncharged criminal acts are similar in

nature than the charged crimes.  In any event, any potential

prejudice to the defendant can be effectively mitigated by a

cautionary instruction limiting the jury's consideration of the

evidence to the purposes for which it is offered.  See United

States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

16

CONCLUSION

        For the reasons set forth above, the government's motion in limine should be granted.

Dated:     Brooklyn, New York
           September 26, 2011

                           Respectfully submitted,

                           LORETTA E. LYNCH
                           United States Attorney
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

Elizabeth Geddes
Allon Lifshitz
Assistant U.S. Attorneys
    (Of Counsel)